### In re DAN HIXSON CHEVROLET COMPANY, Debtor.

**Joseph COLVIN, Trustee, Plaintiff,**

**v.**

**Richard PETREE, Tax Collector, City of Abilene & Abilene ISD, Citizens National Bank, First National Bank, First State Bank, Dan Hixson, et al.**

Bankruptcy No. 181–00014.
Adv. No. 181–0011.

United States Bankruptcy Court,
N. D. Texas,
Abilene Division.

May 12, 1982.

---

Joseph Colvin, Fort Worth, Tex., Trustee.

Charles Dick Harris, Abilene, Tex., for debtor.

E. Lee Haag, III, Abilene, Tex., for First State Bank.

John D. Walz, Dist. Counsel, Small Business Administration, Lubbock, Tex., for S.B.A.

James Gordon, Abilene, Tex., for First Nat'l Bank.

David Stubbeman, Abilene, Tex., for Citizens Nat'l Bank.

Henry Hart, Abilene, Tex., for Creditors' Committee.

## MEMORANDUM OPINION

JOHN FLOWERS, Bankruptcy Judge.

A 5.77 acre tract of land belonging to the Debtor, Dan Hixson Chevrolet Company, was sold and approximately $305,000.00 of proceeds was placed in escrow after payment of a prior undisputed lien. Several creditors now assert various claims to the proceeds. The evidence before the court was presented through testimony at an evidentiary hearing and by stipulation.

The 5.77 acre tract in question originally belonged to Dan Hixson individually. Hixson, in his individual capacity, executed three notes to First State Bank which were secured both by the 5.77 acre tract and by another tract known as the Volkswagen Building. Proceeds from the first note were used in part to discharge the primary lien on the Volkswagen Building and in part to make a down payment on the 5.77 acre tract. The second and third notes are a cross-collaterization of two personal obligations of Hixson.[1] These three secured notes are the basis for First State's claim.

Subsequently, Hixson transferred title to the 5.77 acre tract to the Debtor. Contemporaneously with this transfer, the Debtor mortgaged the tract to secure a loan made by First National Bank. Later the Debtor executed another deed of trust which is now held by the Small Business Administration. The total amount of debt secured by the 5.77 acre tract greatly exceeds its value.

The Volkswagen Building is still owned by Hixson individually. The Citizens National Bank has two subordinate liens on this property although no evidence was presented as to the time these liens arose.

Several arguments are presented by all parties. Initially First National adopts a unique position for a traditionally secured creditor and argues that "lien" and "claim" under the Bankruptcy Code are not the same and that while First State has a lien against property of the Debtor, it does not have a claim against the Debtor.[2] First National points out that the Debtor did not assume the note in favor of First State and that First State has no claim or right of payment from the Debtor personally and therefore under § 506(d) of the Code, the lien is void. First National's argument is based on the following language in § 506(d):

"(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless—(1) a party in interest has not requested that the court determine and allow or disallow such claim under section 502 of this title . . ."

Under this section liens are unaffected by bankruptcy proceedings unless some interested party objects to the claim. First National asserts it has objected and because First State has no claim, its lien is void. I disagree. "Claim", defined in § 101(4), is a word of art and means a right to payment. A "lien" is a charge against property to secure payment of a debt. See § 101(28). It gives the lienor a right to satisfaction of his debt from the property so charged—a right to payment. The Code specifically deals with the argument presented by First National. Section 102(2) provides that the phrase " 'claim against the debtor' includes claim against property of the debtor". First National attempts to avoid the effect of § 102(2) by asserting that the legislative history states § 102(2) is intended to deal with nonrecourse loan agreements. See

---

1. One of these loans was for home improvements. The purpose of the other loan is unclear.

2. The result of First National's argument is that bankruptcy would vacate all liens where the debtor is not directly liable to the secured party. This is a common situation when real es-

tate has been transferred subject to a mortgage without the transferee assuming the debt. Under state law the transferee has no personal liability on the debt, but the mortgage remains a lien against the land. See *Clark v. Scott*, 212 S.W. 728 (Tex.Civ.App.—Dallas 1919, no writ hist.).

House Report No. 95–595, 95th Cong., 1st Sess. 315 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 28 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. Apparently First National does not consider this a nonrecourse situation. However, this is precisely what it is since the Debtor, as First National readily admits, did not agree to be personally liable for any portion of the debt. Nonrecourse simply means that the lienor may look only to the property subject to his lien to satisfy his debt and cannot look to the debtor personally for payment.

Plaintiffs also assert the applicability of two related yet distinct equitable doctrines—the doctrine of the inverse order of alienation and marshaling or the double funds doctrine.[3] Both doctrines are accepted in Texas.[4] Since the doctrine of inverse order of alienation is an indefeasibly vested equitable right while marshaling is considered inchoate, inverse order of alienation is discussed first.

The doctrine of inverse order of alienation applies when an owner gives a blanket mortgage on a tract or several tracts of land and later conveys or encumbers portions of the property subject to the paramount lien.[5] Although the paramount mortgage may assert his right to have all property subject to his lien sold to satisfy his debt, equitable relief is available to subsequent mortgagees or grantees to protect their interests in some circumstances. If the grantor has conveyed or encumbered only a portion of the property covered by the blanket mortgage, a subsequent grantee or mortgagee can require that the portion of the property retained by the grantor be sold first to satisfy the paramount lienholder's claim.[6] This burden follows the retained portion when it is subsequently conveyed since the first grantee's or mortgagee's equitable rights arise at the time of the conveyance or encumbrance in his favor and those rights cannot be affected by subsequent dealings of his grantor. 4 Pomeroy, *Equity Jurisprudence* § 1224 (5th ed. 1941). When several parcels of land subject to one blanket mortgage are subsequently conveyed or encumbered by the original mortgagor, the respective parcels are liable for the blanket mortgage in the inverse order of their alienation. The last parcel sold or encumbered by the mortgagor is subjected first to satisfaction of the blanket mortgage.[7]

The inverse order of alienation does not apply when there is evidence of an intent that the doctrine should not be invoked. *Maurer v. Arab Petroleum Corp.*, 134 Tex. 256, 135 S.W.2d 87 (1940, opinion adopted).[8] This intent is demonstrated

---

**3.** Only the Small Business Administration urges the inverse order of alienation.

**4.** See *Hawkins v. Potter*, 62 Tex.Civ.App. 126, 130 S.W. 643 (1910, writ ref'd) applying the inverse order of alienation and *Wolfe v. Houston Land & Irrigation Co.*, 44 Tex.Civ.App. 379, 98 S.W. 1069 (1906, no writ hist.) applying marshaling.

**5.** For the purpose of applying the inverse order of alienation, all encumbrances created on individual parcels subject to the blanket mortgage are regarded as alienations pro tanto and the doctrine applies as if all subsequent mortgages were outright conveyances. Annotation, *Sale in Inverse Order of Alienation*, 131 A.L.R. 4, 52 (1941).

**6.** Even those jurisdictions which do not recognize inverse order of alienation require property retained by a grantor to be used first to satisfy the blanket mortgage. 53 Am.Jr.2d, Marshaling Assets, § 44.

**7.** Some jurisdictions follow the rule of apportionment presented in the English case of *Barnes v. Racster*, 1 Younger & C. Ch. Cas. 401, 62 Eng. Reprint 944 (1842) rather than the rule of priority inherent in inverse order of alienation. Each parcel conveyed subsequent to the paramount mortgage is charged with its share of the paramount encumbrance. The mortgage debt is prorated between the parcels according to their respective values. *Vandever Investment Co., Inc. v. H. E. Leonhardt Lumber Co.*, 503 P.2d 185 (Okl.1972); *Omaha Nat'l. Bank v. Continental Western Corp.*, 203 Neb. 264, 279 N.W.2d 339 (1979); *Gilliam v. McCormack*, 85 Tenn. 597, 4 S.W. 521 (1887); *Green v. Rampage*, 18 Ohio 428 (1849); 53 Am.Jur.2d, Marshaling Assets, § 47.

**8.** The doctrine also is precluded by a subsequent grantee or mortgagee's lack of notice of an earlier conveyance. Green, *Marshaling Assets in Texas*, 34 Tex.Law.R. 1054 (Oct. 1956); *Magee v. Snell*, 197 S.W. 364 (Tex.Civ.App.—Ft. Worth 1917, writ ref'd). Jurisdictions split

when the subsequent mortgagee or grantee assumes the paramount debt or expressly takes his interest subject to it. 53 Am. Jur.2d, Marshaling Assets § 64. Under these circumstances it cannot be said that the mortgagor equitably had the primary responsibility of discharging the paramount mortgage debt. Therefore, any property retained by him and later encumbered or conveyed is not sold in the inverse order of alienation.

■ In this case, First State is the paramount lienholder with a blanket mortgage on both the 5.77 acre tract and the Volkswagen Building. Although both tracts are charged with satisfaction of this debt, the doctrine requires First State to recognize the equitable positions of subsequent encumbrancers and transferees and to look initially to any interest retained by Hixson, the original grantor. Although Hixson has transferred his interest in the 5.77 acre tract, he still owns the Volkswagen Building, subject to its encumbrances. Any equity of Hixson in this building theoretically must be used first to satisfy First State's lien. However, no evidence was presented as to the extent, if any, of Hixson's equity in the Volkswagen Building. Because the Small Business Administration has not shown Hixson retains an asset of value, I will not further delay First State's satisfaction of its debt. The grantor's retained interest may be reached only if there is no injustice to the paramount encumbrancer such as undue delay or the necessity of litigation to reach the asset. Id., §§ 4, 13, 44. Therefore, application of the inverse order of alienation to reach any equity of Hixson in the Volkswagen Building is denied.

■ The Small Business Administration urges that the doctrine be further applied and that the parcel subject to First State's blanket mortgage which was last sold or encumbered be used first to satisfy First State's lien. I am at a loss simply because there is no evidence in the record showing the order in which the conveyance and various encumbrances took place. The record is blank concerning the dates and terms of the two mortgages held by Citizens National. I must point out that while this court has actual knowledge of the contents of one of these deeds of trust, the information comes from outside the record.[9] Neither of the instruments was admitted into evidence nor was there any testimony regarding their dates or provisions.[10] Whether the dates recited in the mortgages are the effective dates of the instruments is unknown; nothing in the record establishes this fact. For this court to assume the role of adversary in this case and supply missing crucial evidence is an abrogation of its role as an independent and impartial decisionmaker. I will not consider the deeds of trust in favor of Citizens National because they are not properly before me. Consequently, there is no proof that the Small Business Administration's lien, First National's lien or the conveyance from Hixson to the Debtor occurred prior to one or both of Citizens National's mortgages in the Volkswagen Building.[11] The Small Business Adminis-

on the question of whether proper recordation of the first subsequent mortgage or grantee's interest is constructive notice of his superior equity to those grantees and mortgagees who later take interests in other tracts. One Texas case indicates such record notice is sufficient. See *Hawkins v. Potter,* supra. It is unnecessary here to reach the issue of notice, actual or constructive, since no party raises it.

9. It is attached to a claim filed by Citizens National in the basic bankruptcy case.

10. I have taken the added precaution of having the record transcribed to be certain that no testimony regarding these liens was overlooked.

11. The time of the conveyance from Hixson to the Debtor is important because First National and the Small Business Administration took their interest in the 5.77 acre tract with the same equities the Debtor has in the property. Annotation, *Sale in Inverse Order of Alienation,* 131 A.L.R. 4 (1941); Pomeroy, supra, § 1255. If the conveyance to the Debtor occurred prior to one or both of the mortgages to Citizens National then First National and the Small Business Administration might be able to require sale in the inverse order of alienation based on the Debtor's superior equity regardless of the point in time their liens arose. *Id.* The question is not reached because of the lack of proof.

tration has failed to prove the superior equity necessary to require First State to look first to the Volkswagen Building to satisfy its lien. Further, assuming that one or both of Citizens National's liens arose prior to the conveyance from Hixson to the Debtor, the Small Business Administration has not shown that Citizens National took the Volkswagen Building subject to First State's lien or that either Citizens National or Hixson intended that Citizens National's interest would be charged with primary or equal liability for First State's debt. Therefore, further relief under the doctrine of inverse order of alienation is denied.

 First National and the Small Business Administration also assert the applicability of marshaling or the double funds doctrine. This theory is also easily expressed in the abstract. When a paramount creditor has liens on two funds from which to satisfy his debt and a creditor with a subsequent lien has only one fund from which to satisfy his debt, the subsequent creditor may require the paramount creditor to resort initially to the singly charged fund. See *Meyer v. U.S.*, 375 U.S. 233, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963). The basic premise is the same as that of the inverse order of alienation; although all funds are liable for satisfaction of the paramount lien, the paramount creditor must recognize the equities of parties whose liens arose subsequently. There are two reasons to deny marshaling. First, the basic elements required to invoke marshaling are not all present. Defendant's arguments center around two of these elements: (1) the existence of two creditors with a common debtor and (2) the existence of funds belonging to the common debtor. *In re A.E.I. Corp.*, 11 B.R. 97 (Bkrtcy.E.D.Pa.1981). First State urges that the creditors do not have a common debtor. Section 102(2) of the Bankruptcy Code construes a claim against the property of the debtor as a claim against the debtor. It is a fair construction to find that because the Debtor is liable to all parties holding liens against the 5.77 acres although it has no personal liability to First State, there is a common debtor. These three lienholders are all looking to the

Debtor's assets for satisfaction of their claims. However, I am persuaded by Citizens National's argument that there are not two funds belonging to the common debtor. The parties stipulated that Hixson individually is separate from the Debtor. Hixson owns one of the funds, the Volkswagen Building and the Debtor owns the other fund, the 5.77 acre tract. Plaintiffs urge this court to disregard the apparently distinct nature of these entities, a remedy applied by courts under proper circumstances. See *Farmers and Merchants Bank v. Gibson*, 7 B.R. 437 (Bkrtcy.N.D.Fla.1980); *Moser Paper Co. v. North Shore Publishing Co.*, 83 Wis.2d 852, 266 N.W.2d 411 (Wis. 1978); *Carter v. Tanners Leather Co.*, 196 Mass. 163, 81 N.E. 902 (1907). For example, when property held individually is deemed by a court of equity to have been contributed to the capital of a corporation or partnership, the court may pierce the veil of separateness of the parties and allow marshaling of the contributed assets as though one common debtor exists. There is no evidence Hixson contributed the Volkswagen Building to the Debtor's capital. Nor do Plaintiffs present any other facts enabling this court to ignore the separate nature of Hixson and the Debtor. They allege that when they advanced money to the Debtor, they did so with the understanding that First State would look to the Volkswagen Building as its primary source of security. Since no evidence was presented on this point, it is not a reason to ignore Hixson and the Debtor's distinct identities. I therefore find the two funds available to satisfy First State's debt do not belong to the same debtor. Since one of the basic elements for marshaling is not present, marshaling is denied.

 A second reason to deny marshaling is that application of the doctrine becomes more complex when both funds available to the paramount creditor are subject to subordinate liens in favor of different creditors since marshaling generally may not be required to the detriment of a third party. Exceptions to the general rule are made when one subordinate lienor has a

superior equity to the other subordinate lienors and may therefore require that marshaling be invoked despite injury to third parties. Brunner, *Doctrine of Marshaling Assets Where the Two Funds Covered by the Paramount Lien are Subject Respectively to Subordinate Liens in Favor of Different Creditors*, 76 A.L.R.3d 326, 330 (1977). A common example of a superior equity recognized in the majority of jurisdictions including Texas occurs when the lien of one subordinate lienor arises prior in time to the lien of other subordinate lienors. *Id., North Texas Loan and Trust Co. v. Denison*, 58 S.W.2d 858 (Tex.Civ.App.—Dallas 1933, no writ. hist.). The party requesting the application of marshaling has the burden of proving its superior equity. *Moody Day Co. v. Westview National Bank*, 452 S.W.2d 572 (Tex.Civ.App.—Waco 1970, writ ref'd. n. r. e.). Again, Plaintiffs have not met their burden of proof. As discussed above, there is no showing that their liens arose prior to one or both of Citizens National's liens. Similarly, there is no showing of any other equitable consideration by which Plaintiffs can claim any equity superior to that of Citizens National. Because Plaintiffs do not show a superior equity, their request for relief by marshaling is denied as prejudicial to the rights of a third party, Citizens National.

██ The Small Business Administration also contends that when Hixson conveyed the 5.77 acres to the Debtor without assumption by the Debtor of the obligation to First State a surety relationship was created. It argues that the proceeds of the property of the Debtor will be used to pay off an obligation of Hixson and that the Debtor should be subrogated to the priority position of First State in the Volkswagen Building. The Small Business Administration relies on *Ricketts v. Alliance Life Insurance Co.*, 135 S.W.2d 725 (Tex.Civ.App.—

Amarillo 1939, writ dism. judgm. cor.) in which the court states the general rule that a purchaser is not technically a surety for his vendor but "... in virtue of his ownership of lands encumbered by the ... mortgage against the grantor under whom he claims title, who conveyed the same for full value with covenants of warranty, he occupies a position very similar to that of sureties, and is entitled to the same equities ..." *Id.* at 734. First, the Small Business Administration presented no evidence regarding the convenants of warranty given by Hixson or consideration, if any, paid by the Debtor. It is therefore unclear whether the Debtor is entitled to the surety-like position described in *Ricketts.* Further, as to subrogation, that right arises when one party pays the debt of another. 53 Tex. Jr.2d Subrogation, § 4. The grantee is *Ricketts* made actual payments on the primary debt and was entitled to subrogation only for the amount actually paid. "Payment" is a broad concept and encompasses more than actually tendering cash to the secured creditor. For example, tendering a valuable asset to the secured creditor may also be a payment.[12] The fundamental difference between *Ricketts* and the case sub judice is that the Debtor is not tendering an asset in which it holds a valuable interest to First State, the secured party. Looking at the record there is no evidence the Debtor paid any consideration for the 5.77 acres. There is evidence that while in the Debtor's possession, the property consistently has been worth less than the liens against it; there has never been enough value in the property to discharge any portion of the debts owed to First National or the Small Business Administration, the second and third lienholders. Therefore, I find that the turnover of proceeds from the sale of the Debtor's asset is not the surrender of a valuable asset of the Debtor and does not entitle the Debtor to be subrogated to First State's secured position in other assets.

12. Consider the situation in which a party owns a piece of property free of liens which he offers as collateral to secure the debt of a third party. If the third party defaults on his mortgage payments and the mortgagee forecloses on property securing the debt, the party pledging his property loses a valuable asset for the benefit of the secured creditor. Under these facts, the pledgor may have a right to be subrogated to any other assets securing the same debt. The same reasoning applies when a party pledges his equity in property to secure the debt of a third party since he has pledged an asset which is of actual value to him.

The Trustee urges that the second and third liens of First State which secure Hixson's personal obligations be assigned to the estate. This is virtually the same as subrogating the Debtor to First State's security. For the reasons discussed previously with regard to the Small Business Administration's request for subrogation, the Trustee's request for assignment of the liens is denied. There is another reason for denying the Trustee's request. The duties of a trustee in a Chapter 7 liquidation case include collecting and liquidating assets of the estate for the benefit of the creditors. See § 704(1). Liquidation is not a duty of the Chapter 11 trustee. See § 1106(a). Allowing subrogation to First State's position and thereby giving the Trustee the right to foreclose in satisfaction of the assigned liens is liquidation of estate assets. Such action at this point would benefit the Debtor but not creditors who are bound by the Debtor's confirmed plan to accept payments pursuant to that plan. § 1141(a).

Finally, the Small Business Administration argues that Plaintiffs are entitled to adequate protection under § 361 of the Bankruptcy Code as creditors adversely affected by the sale of their collateral. Creditors are entitled to adequate protection only for the secured portion of their claim. See House Report No. 95–595, 95th Cong., 1st Sess. 338 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 49 (1978); 2 *Collier on Bankruptcy* ¶ 361.01 (15th ed. 1981). Under § 506 of the Code a creditor is secured only to the extent of the value of the secured creditor's interest in the interest of the estate in the property upon which that creditor has a lien. The estate's interest in the 5.77 acres is the amount held in escrow after the prior undisputed lien on the property was paid. First State has an interest in that escrow amount by virtue of its uncontested and valid lien on the 5.77 acre tract which the equitable doctrines urged do not alter. The amount in escrow is not sufficient to completely satisfy First State's claim, thus it will have to look to its lien on the Volkswagen Building for full satisfaction. First National as second lienor on the 5.77 acre tract is unsecured since the escrow amount is inadequate to fully satisfy First State's claim. Likewise the Small Business Administration is also unsecured. As unsecured creditors First National and the Small Business Administration are not entitled to adequate protection.

The amount held in escrow will be paid to First State Bank in satisfaction of its lien. It is so Ordered.