In re MID–WEST MOTORS, INC., d/b/a Honda of Midland, Debtor.

FIRST CITY NATIONAL BANK OF MIDLAND, Movant,

v.

MID–WEST MOTORS, INC., d/b/a Honda of Midland, Respondent.

Bankruptcy No. 186–10338–11.

United States Bankruptcy Court, N.D. Texas, Abilene Division.

Feb. 17, 1988.

Joseph C. Elliott, Plunkett, Gibson & Allen, San Antonio, Tex., for Bank.

Charles A. Beckham, Jr., Kemp, Smith, Duncan & Hammond, El Paso, Tex., for FDIC.

Charles Dick Harris, Harris & McBeath, Abilene, Tex., for debtor.

Bankruptcy Rule 7052 which is made applicable to Contested Matters by Bankruptcy Rule 9014.

Billy W. Boone, Abilene, Tex., for Unsecured Creditors Committee.

## MEMORANDUM OF OPINION ON COVENANT NOT TO COMPETE AND MARSHALING OF ASSETS

JOHN C. AKARD, Bankruptcy Judge.

First City National Bank of Midland (Bank) filed a Motion for Marshaling of Assets seeking to have the Federal Deposit Insurance Corporation, as the Successor in Interest to the First National Bank of Midland, Texas (FDIC), satisfy its liens out of otherwise unencumbered assets of the estate. The Bank would then be able to satisfy a larger portion of its indebtedness from assets upon which it presently has a second lien. The Debtor and the Unsecured Creditors Committee opposed the motion. Since the principal assets of the Debtor have been sold, this case is rapidly becoming a liquidating Chapter 11.

### FACTS

The Debtor operated automobile dealerships in Midland and Abilene, Texas. The FDIC has a properly perfected lien on substantially all of the Debtor's assets, including vehicles, automotive parts, contract rights, general intangibles and the proceeds of the collateral. The indebtedness to the FDIC is $230,000.00.[1] The Bank requests that the FDIC be ordered to satisfy its obligations in the following order:

a. First, out of the proceeds of the sale of automotive parts totaling $68,000.00[2] The FDIC had the only lien on automotive parts.

b. Second, from items which the Bank asserts are covered by the FDIC's lien on contract rights and general intangibles, namely:

(1) The sum of $1,000.00 received for the telephone number and going concern value of the Debtor's Midland, Texas operation when it was sold;[3] and

(2) The sum of $350,000.00 received by the Debtor for a covenant not to compete in connection with the sale of the Midland operation. Both the Debtor and Milton L. Nickel, the President and principal shareholder of the Debtor, signed the covenant not to compete. The terms of the contract provide that neither Mr. Nickel nor the Debtor will compete with the purchaser within a specified area for a specified time. The contract, with Mr. Nickel's agreement, provided that all consideration for it would be paid to the Debtor.

If the claim of the FDIC is satisfied from the two items described above, the balance would be available for administrative expenses and priority claims, but no funds would be available for unsecured creditors. The FDIC's first lien on vehicles would be released because the FDIC's claim would be satisfied and the Bank's second lien on vehicles would rise to first-lien status allowing the Bank to receive partial satisfaction of its claim of $1,286,500.00 from the $660,000.00 proceeds of the sale of new and used cars and the $120,000.00 proceeds from the sale of Isuzu automobiles. This would leave the Bank with a substantial unsecured deficiency.

The Debtor and the Unsecured Creditors Committee assert that the FDIC has no lien on the proceeds of the covenant not to compete. They also assert that marshaling should be applied for the benefit of the unsecured creditors by requiring that the FDIC's claim be satisfied out of the proceeds of the sale of vehicles, resulting in a smaller payment to the Bank on its lien and freeing the proceeds of the sale of the automotive parts and the covenant not to compete for use in paying administrative expenses, priority claims and unsecured claims. They estimate a 20% to 50% distribution to the unsecured creditors if the Court orders this procedure.

---

1. All figures are approximate.

2. Apparently the parts were sold in two groups for $16,000.00 and $52,000.00.

3. No issue was raised as to whether the Debtor had a proprietary right in a telephone number. The Court concludes that the Bank's lien covers these items.

*Issues*

1. Is the covenant not to compete covered by the FDIC's lien on general intangibles?

 a. The Bank asserts that the Debtor's right to do business was an intangible asset of the business which existed prior to the filing of the Bankruptcy Petition and, thus, the funds paid for the covenant not to compete (the giving up of that right) are the proceeds of the sale of a prepetition asset under § 552(b) of the Bankruptcy Code.[4]

 b. The Debtor and the Unsecured Creditors Committee counter that the buyer who purchased the Midland operation was not contemplated when the bankruptcy was filed, but was a purchaser found at a later date. They assert that the covenant not to compete is a postpetition contract right and, thus, not subject to the FDIC's prepetition lien.[5]

2. Does the marshaling of assets doctrine require the FDIC to satisfy its debt first out of otherwise unencumbered assets so as to free up some assets for the benefit of the Bank and to the detriment of the unsecured creditors?

### COVENANT NOT TO COMPETE

■ Under bankruptcy law, lien rights of creditors are fixed as of the date the petition is filed. § 544(a); *In re Neuenschwander*, 73 B.R. 327 (Bankr.S.D.Fla. 1987). In *Freightliner Market Development Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362 (9th Cir.1987), the Court had to decide whether transportation operating authorities were property of the estate and general intangibles subject to Freightliner's perfected security interest. Based on that security interest the Bankruptcy Court held that Freightliner had an interest superior to that of the Trustee in the proceeds of the sale of Debtor's transportation operating authorities. The Bankruptcy Court stated that: "Given the fact that the operating rights in this case have, in fact, been transferred to the buyer's satisfaction, further inquiry ... is pointless. If the rights produce proceeds, those rights are in fact 'property'. Since plaintiff's security interest therein was properly perfected, its interest is superior to that of the trustee." The Ninth Circuit agreed, stating that "[t]he transportation operating authorities are property as between these two private parties and are therefore general intangibles subject to Freightliner's security interest." *Id.* at 369.

■ In this case the Debtor signed a covenant not to compete. A covenant not to compete is an agreement in restraint of trade and, therefore, illegal unless it is reasonable in scope, supported by consideration, and ancillary to a lawful contract. 51 Tex.Jur.3d *Monopolies and Restraints of Trade* §§ 17, 18 (1986).

Where the restraint imposed is reasonable, the seller of a business may validly agree to refrain either from starting another business in competition with the buyer or from disposing of his property in such a manner that third parties may engage in a similar business in competition with the buyer. Such provisions are necessary to secure the goodwill purchased by the buyer of the business. Such restraints may validly relate not only to the carrying on of a similar business, but also to the acceptance by the seller of similar employment and to his aiding of others in pursuing a similar business. Money paid for the business and the restrictive covenant constitutes a sufficient consideration to support the covenant. *Id.* § 18.

In *Hengalo Enterprises, Inc. v. Sun Bank of Miami, Inc., (In re Hengalo Enterprises, Inc.)*, 51 B.R. 54 (Bankr.S.D.Fla. 1985) the Court found that the creditor's security interest in the Debtor's general

---

**4.** The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to Section numbers are to Sections in the Bankruptcy Code.

**5.** Undoubtedly the Debtor's position in this matter is attributable to the fact that there are substantial unpaid withholding taxes for which Mr. Nickel, as President of the Debtor, would have personal liability if they are not paid through the bankruptcy proceeding.

intangibles included franchise agreements with automobile companies. Real estate sales contracts are general intangibles. *Castle Rock Industrial Bank v. S.O.A.W. Enterprises, Inc., (In re S.O.A.W. Enterprises, Inc.)*, 32 B.R. 279 (Bankr.W.D.Tex. 1983). Insurance expirations (i.e., customer lists and the right to solicit renewals or replacements) covered by agency agreements are general intangibles. *Commercial Union Insurance Co. v. Davies Insurance Services, Inc., (In re Davies Insurance Service, Inc.)*, 33 B.R. 252 (Bankr.W. D.Pa.1983).[6] The 1972 Official U.C.C. Comment[7] states:

> The term "general intangibles" brings under this Article miscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are *goodwill*, literary rights and rights to performance. (emphasis added)

Clearly the general intangibles, upon which the FDIC had a lien, included the goodwill of the Debtor's business. That goodwill only has monetary value when it is sold along with the business. The way that monetary value is realized is through the payments which the buyer makes for the covenant not to compete.

The Court therefore concludes that the FDIC's lien on general intangibles includes the payments made by the buyer with respect to the covenant not to compete.

### MARSHALING

The elements of marshaling are:

1. That the creditors are creditors of the same debtor;

2. That there are two funds belonging to that debtor, and

3. That one creditor alone has the right to resort to both funds. *Peoples Bank of Tuscaloosa v. The Computer Room, Inc.*

*(In re The Computer Room, Inc.)*, 24 B.R. 732, 734 (Bankr.N.D.Ala.1982).

Where a paramount creditor has liens on two funds from which to satisfy his debt and a creditor with a subordinate lien has only one fund from which to satisfy his debt, the subordinate creditor may require the paramount creditor to resort initially to the singly charged fund. *Meyer v. U.S.*, 375 U.S. 233, 236, 84 S.Ct. 318, 320, 11 L.Ed.2d 293 (1963). If the lienholder fails to show a superior equity in property, his request for relief by marshaling will be denied if prejudicial to the rights of a third party. *Colvin v. Petree, (In re Dan Hixson Chevrolet Company)*, 20 B.R. 108 (Bankr.N.D.Tex.1982). For the marshaling doctrine to apply, the parties must be creditors of the same debtor and both funds must belong to one debtor. *Id.* at 113. The doctrine cannot be invoked if it delays or inconveniences the paramount creditor in collection of a debt, prejudices him in any manner, or if the properties are insufficient to satisfy the paramount lien. *Bewley Mills v. First National Bank*, 110 S.W. 2d 201 (Tex.Civ.App.—Ft. Worth, 1937, writ dis'd.), *Moody Day Company v. Westview National Bank*, 452 S.W.2d 572 (Tex. Civ.App.—Waco, 1970, writ ref'd. n.r.e.). The doctrine can only be invoked where the paramount creditor's right to resort to both funds is clear and the remedies available for reaching the funds are reasonably prompt and efficient. *Bewley Mills* at 210.

The basis of the rule of marshaling is that a person who may by law control application of two or more funds cannot use his legal advantage to exclude the demand of a fellow creditor whose legal recourse is to only one of them. 17 Tex. Jur.3d *Creditor's Rights and Remedies* § 64 (1986). *Bow v. Hodges*, 101 S.W.2d 1043, 1045 (Tex.Civ.App.—Texarkana 1937, no writ). The doctrine of marshaling rests on equitable principles alone and may not be invoked in favor of one whose equities

---

**6.** As of January 1, 1974, § 9.318 of the Texas Business and Commerce Code was amended deleting reference to contract rights because contract rights would be consumed by § 9.106 definitions of an account or general intangibles.

Acts 1973, 63rd Leg., P. 999, ch. 400, § 5, effective January 1, 1974.

**7.** Cited in the notes to § 9.106 of the Tex.Bus. & Comm.Code.

are inferior to those of the other party. The one who invokes the doctrine must come into Court with clean hands. *Daugherty v. White*, 257 S.W. 976, 980 (Tex.Civ. App.—Amarillo, 1924, no writ). If a third party holds a superior lien or will be injured, the rule will not be applied. *Id.*

The doctrine of marshaling has historically been applied for the benefit of a subordinate lien creditor. Some courts have allowed marshaling for the benefit of unsecured creditors. See *Berman v. Green (In re Jack Green's Fashions for Men—Big and Tall, Inc.)* 597 F.2d 130, (8th Cir.1979). Other Courts have denied it. *Colvin, supra.* Typically these cases involve a creditor who has recourse both to assets of the bankruptcy estate and to assets or guarantors who are not in the bankruptcy proceeding. The Courts which have allowed marshaling for the benefit of unsecured creditors have generally allowed it on the basis of some alter ego theory or the piercing of the corporate veil.[8] However, this case involves the classic marshaling situation where both funds are owned by a single debtor. The question which this Court must decide is whether the doctrine will be applied in favor of the Bank (the subordinate lien creditor) or in favor of the unsecured creditors. Given these choices, the Court feels that it must follow the historical precepts of the marshaling doctrine and require that the marshaling be done for the benefit of the Bank. The assets in question have already been sold and the proceeds reduced to cash. Consequently there will be no delay or inconvenience to the FDIC (as the holder of the paramount lien) by application of this doctrine for the benefit of the Bank.

---

8. See *Peoples Bank, supra.;* Mosman, Comment "The Proper Application of Marshaling on Behalf of Unsecured Creditors" 1983 Brigham Young University Law Review 630; and Lachman, Comment "Marshaling Assets in Bankruptcy: Recent Innovations in the Doctrine" 6 Cardozo Law Review 671 (1985).