Filed:  May 6, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 93-2095
(CA-93-655-A, BK-92-14879-AT)

John A. Andrews,

Plaintiff - Appellant,

versus

The Riggs National Bank of Washington, D.C.,

Claimant - Appellee.

O R D E R

The Court amends its opinion filed April 1, 1996, as follows:

On page 4, first full paragraph, line 2 -- "Chapter VII" is corrected to read "Chapter 7."

For the Court - By Direction

/s/ Bert M. Montague

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: JOHN A. ANDREWS,
Debtor.

JOHN A. ANDREWS,
Plaintiff-Appellant,

v.

THE RIGGS NATIONAL BANK OF

No. 93-2095

WASHINGTON, D.C.,
Claimant-Appellee,

RICHARD G. HALL,
Trustee-Appellee,

v.

FIRST AMERICAN BANK OF VIRGINIA,
Claimant.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-93-655-A, BK-92-14879-AT)

Argued: May 13, 1994

Decided: April 1, 1996

Before WIDENER and WILKINS, Circuit Judges, and ELLIS,
United States District Judge for the Eastern District of Virginia,
sitting by designation.

_____

Affirmed by published opinion. Judge Ellis wrote the majority opinion, in which Judge Wilkins joined. Judge Widener wrote a dissenting opinion.

---

**COUNSEL**

**ARGUED:** Stephen Everett Leach, TUCKER, FLYER & LEWIS, P.C., Washington, D.C., for Appellant. Philip John Harvey, SHAW, PITTMAN, POTTS & TROWBRIDGE, Alexandria, Virginia, for Appellee.

---

**OPINION**

ELLIS, District Judge:

This appeal requires us to decide whether payments to a bankrupt debtor pursuant to a non-competition agreement constitute "earnings from services performed" under 11 U.S.C. § 541(a)(6). The bankruptcy court found that the non-competition agreement was ancillary to a pre-petition transaction, and thus payments under the agreement did not fall within § 541(a)(6). The district court agreed. Because we concur, we affirm.

I.

Appellant John A. Andrews ("Andrews") worked in the ready-mix concrete business most of his life. In 1974, he and various partners formed a ready-mix concrete company in Herndon, Virginia. The company, which ultimately came to be known as AMAX Corporation ("AMAX"), grew to be quite successful, with annual sales of approximately thirty million dollars. As a part owner of AMAX, Andrews was personally active in the company and consequently developed numerous and substantial customer contacts and relationships in the concrete business. He expanded these contacts in 1980 by forming a real estate development company, which allowed him to participate in joint ventures with builders and developers.

2

In 1989, Andrews and the other owners of the company negotiated with Tarmac Acquisition, Inc. ("Tarmac") for the latter to purchase the assets of AMAX and related entities. Both sides to the negotiations retained independent experts to value AMAX's assets. The final sale price of nine million dollars was based on these expert valuations. Tarmac also purchased AMAX's customer list, representing the good will of the company, for an additional one million dollars. At the same time, the principal owners of AMAX, including Andrews, entered into separate non-competition agreements with Tarmac. These agreements were an express condition of the asset sale because Tarmac was concerned about the AMAX principals' substantial customer relationships and contacts in the ready-mix concrete business.

Andrews's non-competition agreement with Tarmac ("NCA"), dated July 17, 1989, provided that he would not compete with Tarmac in the ready-mix concrete business in Northern Virginia, the District of Columbia, or the adjacent portions of Maryland for a period of four years. In exchange, Andrews was to receive one million dollars. Absent setoff,[1] this one million dollars was to be paid in quarterly installments of $62,500, plus ten percent annual interest. Andrews asserts that the payments were structured in this manner to approximate his AMAX salary. Yet, he also concedes that Tarmac arrived at the one million dollar figure based on its estimate of the value of eliminating future competition from Andrews.

Andrews treated his NCA payments as ordinary income for federal tax purposes. This treatment was not to his advantage, as the top tax rate on ordinary income was thirty-one percent, significantly more

---

[1] Andrews's payments under the NCA were subject to setoff by Tarmac if anyone involved with AMAX breached the main contracts for the asset sale, or if Tarmac acquired an indemnification claim against Andrews or the other AMAX principals. Setoffs against Andrews's payments occurred. Specifically, the bankruptcy court found that Tarmac recovered some $400,000 from Andrews through the NCA's setoff mechanism in the years following the asset sale. Andrews agrees that Tarmac exercised its right of setoff against Andrews's NCA payment in the amount of $50,000 during the summer of 1992. He also asserts, however, that he repaid the other $350,000 separately. The bankruptcy court's finding in this regard is neither part of this appeal nor germane to it.

3

than the twenty-eight percent rate that would have been applicable had he claimed the payments as capital gain from the sale of assets. See 26 U.S.C. § 2. In addition, by claiming the NCA payments as ordinary income, Andrews became subject to an additional self-employment tax of between ten and fifteen percent. See 26 U.S.C. §§ 1401-1402.

On October 14, 1992, Andrews filed a voluntary petition for relief under Chapter 7, 11 U.S.C. § 701 et seq., in the United States Bankruptcy Court for the Eastern District of Virginia. On December 4, 1992, Andrews instituted this contested proceeding against the estate trustee Richard G. Hall ("trustee") pursuant to Rule 9014, Fed. R. Bankr. P. The motion initiating the proceeding sought to exclude from Andrews's bankruptcy estate all post-petition payments due him under the NCA. The total of these payments is $250,000 plus interest.**2** According to Andrews, the payments represented his only source of income while the NCA remained in effect because the NCA precluded him from engaging in the ready-mix concrete business. But for the NCA, Andrews asserts, he could have profitably re-entered the ready-mix concrete business.

The bankruptcy court denied Andrews's motion, holding that compliance with a non-competition obligation closely connected with the pre-petition sale of an asset does not constitute "services performed" under 11 U.S.C. § 541(a)(6). The district court affirmed, and this appeal followed.

II.

The question presented is whether the payments due Andrews under the NCA qualify as "earnings from services performed" under 11 U.S.C. § 541(a)(6). If so, they are excluded from Andrews's bankruptcy estate, and he may use and enjoy them free from the claims of his creditors. If not, the payments become part of the estate and hence available to satisfy outstanding creditors' claims.

_____

**2** When Andrews filed his Chapter VII petition, there were four payments remaining under the NCA. These payments, which were due in October 1992 and January, April, and July 1993, have been paid into Andrews's estate. The NCA expired on July 16, 1993.

Analysis properly begins with the language of the statute itself. <u>See United States v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 241 (1989). Section 541 of the Bankruptcy Code provides that the bankruptcy estate consists of certain broadly defined categories of property,**3** but specifically excludes "earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(1), (6). The phrase "services performed" is not defined in the statute. We are left, then, to construe the phrase in accordance with its ordinary meaning or, if that meaning be ambiguous, to give it the meaning most consistent with the statute's purpose. <u>Crandon v. United States</u>, 494 U.S. 152, 158 (1990); <u>see also Kokoszka v. Belford</u>, 417 U.S. 642, 645 (1974) (stating that "purposes of the Bankruptcy Act must ultimately govern" in determining scope and limitations of term "property" in 11 U.S.C. 110a(5)).

As the parties' contentions reflect, the ordinary meaning of the phrase is infected with ambiguity. Thus, Andrews suggests that refraining from competition amounts to "performing services" because it confers a benefit on Tarmac. The trustee responds, more plausibly, that the phrase "services performed" is stretched out of shape if it is taken to include refraining from doing something, i.e., not competing, as contrasted with doing something or taking action. According to the trustee, <u>performing</u> a service implies doing an act, not refraining from doing an act. Although the contest of ordinary meanings tilts somewhat in favor of the trustee's construction, ordinary meaning simply does not answer decisively whether the phrase encompasses refraining from competing pursuant to a non-competition agreement. We must therefore ascertain the purpose of the statutory provision so we can assign to the phrase the meaning most consistent with that purpose. <u>See Crandon</u>, 494 U.S. at 158. This inquiry, of course, is informed by the purposes underlying federal bankruptcy law as a whole.

_____

**3** For example, the estate will include all of the debtor's legal and equitable interests in property, § 541(a)(1), certain interests of the debtor and the debtor's spouse in community property, § 541(a)(2), and any interest in property the debtor acquires by way of inheritance or a divorce settlement within 180 days of the filing of the bankruptcy petition, § 541(a)(5).

5

Section 541, like the Bankruptcy Code generally, has two overarching purposes: (1) providing protection for the creditors of the insolvent debtor[4] and (2) permitting the debtor to carry on and rebuild his life, that is, to make a "fresh start."[5] The first purpose is effectuated through statutory provisions that marshal and consolidate the debtor's assets into a broadly defined estate[6] from which, in an equitable and orderly process, the debtor's unsatisfied obligations to creditors are paid to the extent possible.[7] The second purpose finds expression in the bright line the Bankruptcy Code draws between pre- and post-bankruptcy filing events.[8] Thus, § 541(a)(1) provides that the estate includes the debtor's legal and equitable interests "as of the commencement of the case," and leaves the bankrupt debtor free after that date to accumulate new wealth so that he might make a fresh start following bankruptcy. Similarly, the provision in issue here, § 541(a)(6), allows the debtor to exclude from his estate any compensation or salary he might earn after the date of the petition. Toward the same end, § 727 facilitates the fresh start by ultimately discharging the balance of the debtor's unpaid obligations after the estate is exhausted. See 11 U.S.C. § 727.

Sometimes the Bankruptcy Codes two purposes appear to conflict, as when a debtor claims property to aid his fresh start while his creditors claim the same property to satisfy the debtors obligations to them. Yet, this conflict is illusory, for by drawing the bright line between the debtor's pre- and post-petition assets, the Bankruptcy Code har-

_____

[4] H.R. Rep. No. 595, 95th Cong., 1st Sess. 366-68 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 82-83 (1978).

[5] See Segal v. Rochelle, 382 U.S. 375, 379 (1966).

[6] For instance, § 541(a)(1) provides in pertinent part that property of the estate includes "all legal or equitable interests of the debtor in property" as of the time the bankruptcy petition is filed. 11 U.S.C. § 541(a)(1). Section 541(a)(6) further states that the estate is to include any "proceeds, product, offspring, rents or profits of or from" the estate that accrue even after the estate has been created. 11 U.S.C. § 541(a)(6).

[7] Harman v. First American Bank of Maryland (In re Jeffrey Bigelow Design Group, Inc.), 956 F.2d 479, 487 (4th Cir. 1992); see also H.R. Rep. No. 595, 95th Cong., 1st Sess., 177-78 (1977).

[8] See Goggin v. Division of Labor Law Enforcement, 336 U.S. 118, 125-26 (1949).

6

monizes the two purposes. And it is this bright-line harmonizing principle that provides the decisive clue to construing § 541(a)(6) in this context. This clue points convincingly to the conclusion that payments pursuant to a pre-bankruptcy non-competition agreement are not "earnings from services performed." Only this construction of § 541(a)(6) gives effect to the statutes purposeful distinction between a debtor's pre- and post-petition assets. Pre-petition assets, like the NCA payments, are those assets rooted in the debtor's pre-petition activities, including any proceeds that may flow from those assets in the future. These assets belong to the estate and ultimately to the creditors. Post-petition assets are those that result from the debtor's post-petition activities and are his to keep free and clear of the bankruptcy proceeding.

The Supreme Court, in an analogous setting, acknowledged this bright line in <u>Segal v. Rochelle</u>, 382 U.S. 375 (1966). There, the question presented was whether loss-carryback tax refunds should be included in the debtors estate under § 70a(5) of the Bankruptcy Act, 11 U.S.C. § 110a(5).[9] The refunds stemmed from losses incurred by the debtor prior to the bankruptcy filing. On these facts, the Supreme Court held that the refunds were properly included in the debtor's estate because they were "sufficiently rooted in the pre-bankruptcy past and so little entangled with the bankrupts' ability to make an unencumbered fresh start." <u>Segal</u>, 382 U.S. at 380.

Seen in this light, the NCA payments due Andrews fall clearly on the pre-bankruptcy or "past" side of the bright line. These payments are plainly rooted in, and grow out of, Andrews's pre-petition activities. Thus, it is undisputed that the NCA was more than just contemporaneous with Tarmac's purchase of the AMAX assets; it was an integral part of that purchase.[10] This is precisely what the bankruptcy

_____

[9] Section 541 is the successor provision to § 70a(5), and the legislative history of the Bankruptcy Reform Act of 1978 indicates that the result of <u>Segal</u> remains valid under the current Bankruptcy Code. <u>See</u> H.R. Rep. No. 595, 95th Cong., 1st Sess. at 367-68 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 82-83 (1978).

[10] Andrews, seeking to avoid this conclusion, makes much of the fact that the two experts on whom Tarmac and the AMAX principals relied

judge meant when he found that the NCA was "ancillary" to the sale of the business: but for the asset sale, there would have been no NCA and no quarterly payments to Andrews. Tarmac's right to set off amounts owed it for breach of the purchase agreements from payments to Andrews under the NCA, as well as the express condition of sale that Andrews enter into such an agreement, further evidence the synergistic relationship between these contracts. Given this close connection between the NCA and the pre-petition sale of the debtor's share in the concrete business, we are persuaded that the payments were well "rooted in the pre-bankruptcy past." See Segal, 382 U.S. at 380. We think they were also "so little entangled with the bankrupt's ability to make a fresh start" that they should be included in Andrews's estate. See id.**11**

_____

to value the sale reached a figure of nine million dollars, the ultimate sale price. Because this figure included one million dollars for good will (in the form of customer lists), Andrews argues that the NCA payments were not in fact payments for good will that should be considered part of the sale and thus part of his estate. This argument misses the point. Tarmac made the NCA a condition of the sale, and made the payments thereunder, to protect and maintain the good will it purchased from AMAX. See Unsecured Creditor's Committee v. Prince (In re Prince), 127 B.R. 187, 192 (N.D. Ill. 1991) (holding that agreement not to compete provided in conjunction with sale of business is agreement not to undermine value of good will that has been sold); In re Mid-West Motors, Inc., 82 B.R. 439, 441 (Bankr. N.D. Tex. 1988) ("Such [non-competition] provisions are necessary to secure the goodwill purchased by the buyer of the business."). Because of the nature and extent of Andrews's experience in the ready-mix concrete business, AMAX's going concern value would likely have been worth little, if anything, absent the NCA.

**11** It is true that, at the time of the payments, Andrews could not have competed with Tarmac in the ready-mix concrete business in this area without breaching the NCA. Yet, the NCA expired in mid-1993, less than one year after Andrews filed his Chapter VII petition. He was free to re-enter the business after that time. Moreover, the NCA left Andrews free to pursue a fresh start in any area other than ready-mix concrete. Significantly, Andrews had previously been involved in the real estate development business. Although it is unclear whether he maintained this business after filing his bankruptcy petition, there is no evidence that he could not have done so in order to obtain funds for his fresh start.

8

In sum, § 541(a)(6)'s purpose, aided by its more plausible ordinary meaning, compels the conclusion that "earnings from services performed" should not be construed to include payments made under the NCA between Andrews and Tarmac. Were the rule otherwise, debtors would be able, indeed invited, to circumvent the bankruptcy laws through clever use of agreements not to compete. Specifically, a debtor selling a business, yet anticipating filing bankruptcy, could divert sale proceeds from the bankruptcy estate by shifting these proceeds from pre-petition sales payments to post-petition non-competition payments. There, as here, the post-petition non-competition payments are not part of the debtor's fresh start efforts, but rather payments that are rooted in the debtor's pre-petition conduct. As such, these are payments that § 541(a)(6) contemplates should be included in the bankruptcy estate.

No other circuits appear to have confronted this precise question.[12] Among lower courts that have done so, however, we find ample support for our conclusion.[13] And the only cited contrary authority is inapposite or unpersuasive. First, Andrews urges that the decision in Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985), compels a different result from that reached here. That decision, however, is largely irrelevant to the instant case. Lubrizol merely held that continuing duties of notice and forbearance could render a contract executory for the purposes of § 365, a bankruptcy provision that applies in a context different from that of § 541. See Lubrizol, 756 F.2d at 1045. From this, Andrews argues that the NCA is executory in nature and therefore that post-petition payments were made in exchange for post-petition forbearance. The argument is unconvincing. Even assuming the NCA may

---

**12** As the dissenting opinion correctly notes, the terse reference to this issue in Matter of Walden, 12 F.3d 445 (5th Cir. 1994), is dictum.

**13** See, e.g., In re McDaniel, 141 B.R. 438, 440 (Bankr. N.D. Fla. 1992) (finding payments to former employee in exchange for non-competition agreement not made for services performed and thus not excluded from estate under § 541(a)(6)); In re Prince, 127 B.R. at 192 (holding consideration for covenant not to compete contained in purchase agreement for sale of business not tantamount to "earnings from services performed" post-petition); In re Bluman, 125 B.R. 359, 363 (Bankr. E.D.N.Y. 1991) (same).

9

be characterized as an executory agreement,**14** it does not thereby follow that the contract is one for the <u>performance of services</u>**15** within the meaning of § 541(a)(6). Furthermore, Congress, in enacting § 365, clearly indicated that rejected executory agreements fall on the prepetition side of the bright line by providing that the rejection will be deemed to have occurred just prior to the filing of the petition. <u>See</u> 11 U.S.C. 365(g); <u>see also</u> H.R. Rep. No. 595, 95th Cong., 1st Sess. 349 (1977) and S. Rep. No. 989, 95th Cong., 2d Sess. 60 (1978) (stating that purpose of § 365(g) "is to treat rejection claims as prepetition claims"). In sum, the purposes underlying the Bankruptcy Code in general, and § 541 in particular, persuasively support the conclusion that the NCA payments are not excludable from the bankruptcy estate, even if the NCA is an executory agreement for purposes of § 365.

One district court has held that payments pursuant to a non-competition agreement are not "property" within the meaning of § 541(a)(1). <u>See In re Hammond</u>, 35 B.R. 219 (Bankr. W.D. Okla.

---

**14** <u>Lubrizol</u> involved a licensing agreement, not a non-competition covenant. <u>See Lubrizol</u>, 756 F.2d at 1045. Significant authority holds that an obligation to refrain from competition does <u>not</u> render a contract executory for the purposes of § 365. <u>See, e.g., In re Hughes</u>, 166 B.R. 103, 105 (Bankr. S.D. Ohio 1994); <u>In re Paveglio</u>, 1995 WL 465339 at *5 (Bankr. M.D. Pa. 1993); <u>In re Drake</u>, 136 B.R. 325, 327-28 (Bankr. D. Mass. 1992); <u>In re Oseen</u>, 133 B.R. 527, 529 (Bankr. D. Idaho 1991); <u>In re Bluman</u>, 125 B.R. at 362; <u>In re Cutters</u>, 104 B.R. 886, 890 (Bankr. M.D. Tenn. 1989). Notably, a number of these decisions came in jurisdictions that had adopted the same definition of executory contracts under § 365 that was adopted by this circuit in <u>Lubrizol</u>. <u>See In re Paveglio</u>, 1995 WL 465339 at *5; <u>In re Oseen</u>, 133 B.R. at 529; <u>In re Bluman</u>, 125 B.R. at 362; <u>In re Cutters</u>, 104 B.R. at 890.

**15** It is principally here that we part company from the dissenting opinion, which appears to assume that an executory contract is necessarily a contract for the performance of services that falls within § 541(a)(6). Yet, the assumption seems unwarranted, for it is at best ambiguous -- even after <u>Lubrizol</u> -- whether a continuing duty of forbearance, sufficient to render a contract executory, is equivalent to a continuing obligation to perform a service. Given the balance of policies reflected in § 541(a), the ambiguity is best resolved in favor of including in the debtor's estate income the debtor receives from his forbearance to compete.

10

1983). The reasoning behind the <u>Hammond</u> court's decision was apparently its conclusion that the debtor had "not done all acts necessary to accrue his right to the future payments." <u>Hammond</u>, 35 B.R. at 223. The court went on to assert that, in order to receive the payments, "Hammond must abide by the agreement. We cannot force him to comply." <u>Id.</u> This statement, however, is manifestly incorrect. Although the Thirteenth Amendment prohibits a court from specifically enforcing a personal service contract, an agreement not to compete is specifically enforceable if it is reasonable. <u>See, e.g.</u>, <u>Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick</u>, 239 Va. 369, 371, 389 S.E.2d 467 (1990). Thus, a bankruptcy court could issue a negative injunction prohibiting a person from engaging in activity violative of a non-competition agreement. The reasoning of <u>Hammond</u> is therefore fatally flawed. No "services" or acts were actually required before Hammond -- or Andrews here -- could acquire a right to payment under the agreement not to compete. In fact, all the debtor had to do to acquire that right was <u>not</u> perform any act that would constitute competition.

Accordingly, we hold that the payments due Andrews under the NCA do not fall within the definition of "earnings from services performed" under 11 U.S.C. § 541(6). These payments were thus properly included in his estate. The judgment of the district court is affirmed.**16**

<u>AFFIRMED</u>

WIDENER, Circuit Judge, dissenting:

I respectfully dissent.**1**

_____

**16** This holding does not, as the dissenting opinion claims, result in the trustee's assumption of the NCA. The trustee never assumed any duty to abstain from competing with Tarmac in the ready-mix concrete business. The only consequence of the holding here is that the remaining NCA payments are included in the debtor's estate, a result consistent with the statute's language and purpose.

**1** In the only other opinion from a court of appeals analyzing the precise problem in this case, the Fifth Circuit, in <u>Matter of Walden</u>, 12 F.3d 445 (5th Cir. 1994), by way of <u>dictum</u>, agrees with the conclusion that I would reach here: post-petition non-competition payments are not property of the bankruptcy estate under 11 U.S.C. § 541(a)(6).

11

I am of opinion that since only Andrews can perform the non-competition agreement, performance that only he can render, then the right to receive Tarmac's payments is not the property of the trustee, for the payments themselves are excluded from property of the estate. They are "earnings from services performed by an individual debtor after the commencement of the case." 11 U.S.C. § 541(a)(6).

The substance of the majority decision is found on page 9-10 of the slip opinion and is:

> From this, Andrews argues that the . . . [non-competition agreement] is executory in nature and therefore that post-petition payments were made in exchange for post-petition forbearance. The argument is unconvincing. Even assuming the . . . [non-competition agreement] may be characterized as an executory agreement, it does not thereby follow that the contract is one for the performance of services within the meaning of § 541(a)(6). (footnote omitted)

I.

In view of this holding, it is well to briefly recount the relevant facts.

Andrews and the other owners sold the assets of their concrete business, called AMAX, to Tarmac for $9 million under the terms of a purchase money agreement.

By virtue of a separate non-competition agreement Andrews agreed not to compete in the concrete business with Tarmac within Tarmac's business territory for a period of four years. The consideration for this separate agreement was $1 million, payable in quarterly installments of $62,500, plus interest. The execution of the non-competition agreement was an express condition of the sale "because Tarmac was concerned about the AMAX principals' substantial customer relationships and contacts in the ready-mix concrete business." Slip p.3. ". . . Tarmac arrived at the one million figure based on its estimate of the value of eliminating future competition from Andrews." Slip p.3. The order of the bankruptcy court, affirmed by the district

12

court and the panel, not only held that the payments under the non-competition agreement were not the property of Andrews, it held that ". . . all payments under the non-competition agreement are property of the bankruptcy estate pursuant to 11 U.S.C. § 541." A.12.

II.

The first proposition I examine is whether or not the non-competition agreement was an executory agreement.

That agreement, in pertinent part, provides:

> 1. Non-competition. In consideration of the payment set forth in § 2 of this agreement by purchaser[Tarmac], for a period of four (4) years after the closing, . . .[Andrews] shall not (i)engage . . . directly or indirectly, in the ready-mix concrete business within the counties (or cities) [naming certain counties or cities in Northern Virginia, Maryland and the District of Columbia] . . . . A.111.

> \* \* \* \*

> 2. Payments. In consideration of the obligations of . . . [Andrews] set forth in § 1 of this agreement, [ . . . Tarmac] shall pay to [Andrews] . . . the sum of $1,000,000 payable in quarterly installments of $62,500 each, together with quarterly interest . . . . A.112.

So the obligation of Andrews not to compete extended for four years after the sale, and the obligation of Tarmac to make the payments extended for a like period of time.

In Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043 (4th Cir. 1985), we decided under the Bankruptcy Code whether or not the contract involved in that case was executory. That contract was a non-exclusive license agreement to utilize a metal coating process in which the licensor (RMF) agreed to give the licensee (Lubrizol) notice of any patent infringement suit or any other use or licensing of the process, and not to license the same to anyone

13

else at a lower royalty payment. The licensee owed to the licensor the duty of accounting for and paying royalties for the life of the contract. The licensor filed a petition in bankruptcy and sought to reject the licensing agreement in order that it might sell or license the technology unhindered.

Among others, we held that the following question had to be decided: "first, whether the contract is executory." 756 F.2d at 1045.

We decided that under 11 U.S.C. § 365(a) ". . . a contract is executory if performance is due to some extent on both sides." 756 F.2d at 1045. We quoted with approval Professor Countryman's definition that a contract is executory if the "`"obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other."'" 756 F.2d at 1045. We held that the contract was executory because of the "unperformed continuing duty of forbearance", 756 F.2d at 1046, on the part of the licensor, as well as other contingent duties, and also the "unperformed and continuing duty of accounting for and paying royalties for the life of the agreement", 756 F.2d at 1046, on the part of the licensee.

In the case at hand, Andrews had the unperformed and continuing duty not to compete with Tarmac for a period of four years, which had not expired at the time he filed his petition in bankruptcy. Tarmac had the unperformed and continuing duty during that same period of making the $62,500 payments so long as Andrews was performing his duty not to compete.

In my opinion, the non-competition agreement at issue here is a perfect example of an executory agreement under the definition of the same in Lubrizol. Performance was due to some extent on both sides for a period of four years. Competing by Andrews or non-payment by Tarmac would undoubtedly have been a material breach of the contract excusing performance by the other.

The majority disposes of Lubrizol as "largely irrelevant to the instant case." Slip p.9. It justifies not following Lubrizol for the reason that Lubrizol was decided under 11 U.S.C. § 365, ". . . a bankruptcy provision that applies in a context different from § 541." Slip

14

p.9. What the majority does not mention is that the reason for the existence of 11 U.S.C. § 365 is executory contracts. The section even has as its catch line the following: "Executory contracts and unexpired leases." (Italics added.) That section, which takes up almost 13 pages of Norton's reprint of the Bankruptcy Code, is devoted entirely to executory contracts and unexpired leases under the Bankruptcy Code. The section is not limited to any particular executory contract, but as to the treatment of executory contracts in general under the Bankruptcy Code, as well as unexpired leases, which latter has no application here.

I therefore suggest that the holding of the majority, that Lubrizol is largely irrelevant, is patent error. If that definition of an executory contract, under the section of the Bankruptcy Code dealing with executory contracts, is not relevant, obtaining a relevant decision under any circumstances would be unlikely. In my opinion, the definition of executory contract in Lubrizol is circuit precedent and should bind us. The contract between Tarmac and Andrews fits exactly within the definition of Lubrizol.

III.

Since the contract between Andrews and Tarmac is not executory, the reasoning of the majority goes, Andrews' refraining from competition with Tarmac is not "services performed" within the meaning of § 541(a)(6) as those "performed by an individual debtor after the commencement of the case." It reasons that "the phrase `services performed' is stretched out of shape if it is taken to include refraining from doing something, i.e., not competing, as contrasted with doing something or taking action." Slip p.5. That question was also addressed in Lubrizol. We followed Fenix Cattle Co. v. Silver (In Re: Select-A-Seat Corp.), 625 F.2d 290, 292 (9th Cir. 1980), for its holding that "an obligation of a debtor to refrain from selling software packages under an exclusive licensing agreement made a contract executory as to the debtor notwithstanding the continuing obligation was only one of forbearance." 756 F.2d at 1045-46. We then addressed the question at hand in that case and held: "[a]lthough the license to Lubrizol was not exclusive RMF owed the same type of unperformed continuing duty of forbearance arising out of the most favored licensee clause running in favor of Lubrizol. Breach of that

15

duty would clearly constitute a material breach of the agreement." 756 F.2d at 1046.

That holding of <u>Lubrizol</u> also is, of course, contrary to the majority opinion in this case which has held that forbearance is not a service under the statute.**2**

IV.

The decision of the majority is that the Trustee has the benefit of Andrews' non-competition contract with Tarmac because payments under the contract are ordered to be given to the Trustee. Thus the effect of the majority decision is that the Trustee has assumed the executory contract in order that he might receive the benefits under it, that is to say, the $62,500 payments. What the majority does not mention, however, is 11 U.S.C. § 365 (c)(1), the pertinent text of which is:

> (c) The trustee may not assume . . . any executory contract . . . if--
>
> (1) (A) Applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from or rendering performance to an entity other than the debtor . . . and
>
> (B) Such party does not consent to such . . . assumption.

The non-competition agreement in this case can be performed only by Andrews. Indeed, the majority opinion clearly recites that Tarmac was concerned about the AMAX principals' (including Andrews') substantial customer relationships and contacts in the ready-mix concrete business and that the consideration for the agreement was based on Tarmac's estimate of the value of "eliminating future competition from <u>Andrews</u>." (Italics added.) Slip p.3. There is nothing in the non-

_____

**2** The common law is to like effect: "Withholding competition, when not opposed to public policy, is a sufficiently binding consideration." <u>Camden v. Dewing</u>, 34 S.E. 911, 912 (W.Va. 1899).

competition agreement about Tarmac accepting performance from anyone other than Andrews. There is no finding of the bankruptcy court that performance of the non-competition agreement by anyone other than Andrews was acceptable to Tarmac. Indeed, nothing along that line is even suggested.

Therefore, the attempted assumption of the non-competition agreement by the Trustee, in order to get the payments, is a violation of 11 U.S.C. § 365(c)(1)(A) and (B).

17