THOMAS E. BRESSI, JR. AND NANCY M. BRESSI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bressi v. Commissioner
Docket No. 4501-89
United States Tax Court
T.C. Memo 1991-651; 1991 Tax Ct. Memo LEXIS 693; 62 T.C.M. (CCH) 1668; T.C.M. (RIA) 91651; December 30, 1991, Filed *693 Decision will be entered under Rule 155. Michael S. Adelman, for the petitioners. Lisa Primavera-Femia, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income taxes of $ 70,821.09 for 1981, $ 25,728.75 for 1982, and $ 13,002 for 1983 in the notice of deficiency. Respondent later amended the answer to assert an increased deficiency of $ 162,245.26 for 1981. Petitioners borrowed money to purchase and develop land in the Virgin Islands. Petitioners were unable to sell the project and transferred the property (the transfer) to the mortgagee in lieu of foreclosure. The issues in this case involve the tax consequences of the transfer. After concessions, we must decide the following issues: 1. Whether the transfer is a taxable sale or exchange. We hold that it is. 2. Whether petitioners are not taxable on the income from the discharge of indebtedness under section 108[1] because of the insolvency exception under section 108(a)(1)(B), or the purchase money debt reduction exception under section 108(e)(5). We hold they are not eligible for the insolvency or purchase money *694 debt reduction exceptions. 3. Whether petitioners are entitled to an exclusion from income under the tax benefit rule. Sec. 111. We hold they are not. 4. Whether respondent met the burden of proof relating to the increased deficiency in the amendment to answer. We hold that respondent did. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Background
Petitioners are husband and wife who resided in Bryn Mawr, Pennsylvania, when they filed their petition. All references to petitioner in the singular are to Thomas E. Bressi, Jr. During the years involved, petitioner was a practicing general surgeon on the staff of Bryn Mawr Hospital and an Associate Professor of Surgery at the Thomas Jefferson University Medical School in Philadelphia, Pennsylvania. He has practiced medicine since *695 1957. 2. Acquisition and Financing of the Barrier Reefe Property
Petitioner leased three acres of land near St. Croix, Virgin Islands, in 1965 or 1966 and purchased it in 1969. The seller of the land is not identified in the record. Title was taken by a Virgin Islands corporation known as 221A Holding Corporation. The name 221A was derived from the number assigned to that plot of property in the Estate Golden Rock subdivision in St. Croix. The 221A Holding Corporation was a holding company in which petitioner owned 51 percent of the stock. Mr. Rodgers P. Bressi (not otherwise described in the record) owned the remaining 49 percent of the stock. In late summer of 1971, petitioner contracted with a developer to build a 60-unit condominium complex on the property to be called the Barrier Reefe Apartments. The developer, Sofarelli, was a firm from Albany, New York, and had developed large projects in the Virgin Islands. To fund the development, petitioners borrowed $ 2,350,000 from First National City Bank (First National). On November 1, 1971, petitioners and 221A Holding Corporation executed a promissory note and mortgage to First National for that amount. In making *696 the loan First National specified that $ 2 million was for construction and $ 350,000 was for interest on the loan and for other miscellaneous expenses. Petitioner used these funds as specified. In 1973, petitioners borrowed more money for the Barrier Reefe project. On September 7, 1973, petitioners and 221A Holding Corporation executed a $ 150,000 promissory note to First National. The original mortgage was amended on September 17, 1973, to reflect the additional $ 150,000 loan from First National. First National specified that use of the $ 150,000 was limited to the payment of interest. It was so used by petitioner. Petitioners and 221A Holding Corporation also borrowed $ 500,000 from Public Federal Savings and Loan Association (PFSLA) on December 17, 1973. Use of the $ 500,000 borrowed from PFSLA was limited to payment of interest and to furnishing 48 of the units, which limitations were followed by petitioner. The promissory note and mortgage dated November 1, 1971, as amended September 7, 1973, was assigned by First National to PFSLA on December 7, 1973. PFSLA converted the $ 2,350,000 and $ 150,000 promissory notes and accompanying mortgage into a first priority mortgage *697 on December 17, 1973. Including the $ 500,000 loan from PFSLA, the beginning balance on December 17, 1973, of the First Priority Mortgage was $ 3 million. The $ 3 million construction financing was ultimately "rolled over" into a permanent mortgage with PFSLA on December 17, 1973. On August 30, 1974, petitioners executed a bond and a warrant of attorney in the amount of $ 6 million each in favor of PFSLA. The bond referred to the first priority mortgage and incorporated many of the mortgage conditions. The bond provided that petitioners were jointly and severally liable to PFSLA. It provided for discharge of the obligation only upon several conditions, including timely payments on account of all principal and interest, maintenance of appropriate insurance, payments of taxes, sewer and water rents, and other expenses of the development. It prohibited conveyance of the mortgaged premises unless prior written consent is obtained from PFSLA. It provided that if the bond provisions were violated, the bond obligation was to become immediately due and PFSLA had the option of exercising remedies provided in the warrant of attorney. The warrant provided additional remedies and protection *698 for PFSLA. It also provided conditions for which default resulted in acceleration of the bond. It also incorporated the same remedies stated in the bond and the mortgage. Neither the bond nor the warrant indicated that petitioners were excused from ultimate personal liability of any of the obligations that they signed. Some of the funds advanced by First National (promissory notes dated November 1, 1971, and September 7, 1973) and PFSLA (promissory note dated December 17, 1973) were used to pay construction period interest and other expenses. All of the advanced funds which were used to pay construction period interest and expenses were included in the $ 3 million outstanding principal balance of the loan. The property was leased to Barrier Reefe Beach Club, Inc., in late 1973 or early 1974. Barrier Reefe Beach Club was owned by petitioners. There was an interracial shooting with fatalities on a golf course in the Virgin Islands in August 1972. The resulting publicity hurt Virgin Islands' tourism for several years, and hurt petitioner's ability to sell or rent units in the Barrier Reefe property. Petitioner's inability to market or rent these units on a consistent basis *699 during the 1970s resulted in significant financial pressures on him, especially from Trevose Federal Savings and Loan (Trevose), the holder of the original $ 3,000,000 mortgage. PFSLA merged into Trevose sometime after 1978. Petitioners claimed deductions for depreciation, interest, and other expenses in connection with the property on their individual Federal income tax returns for 1971 through 1981. During 1971 through 1974 petitioners reported income and expenses in connection with the property using the cash disbursements method of accounting. From 1975 through 1981 petitioners used the accrual method of accounting to report income from and expenses in connection with the property. 3. Bankruptcy of 221A Holding Corporation
In March 1979 financial pressures caused petitioners to institute Chapter 11 proceedings in the U.S. Bankruptcy Court for the Eastern District of Pennsylvania for 221A Holding Corporation. As of November 30, 1979, the mortgage loan with Trevose was in arrears in the amount of $ 763,884.90, of which $ 538,363 was unpaid interest, $ 25,787.65 unpaid taxes, and the balance unpaid principal. On January 15, 1980, petitioners, 221A Holding Corporation, *700 and Trevose executed an agreement (the workout agreement) giving petitioner an 18-month grace period in which to market the property and cure the arrearage. 4. The Transfer of the Barrier Reefe Property to Trevose, the Mortgagee
The grace period in the workout agreement was extended to October 1981. However, petitioner's marketing efforts were unsuccessful and the mortgage loan arrearages continued. Trevose sent petitioner a series of demand for payment letters calling for payment of $ 3,495,973.06 within five business days or a default would be declared and the Barrier Reefe property deeded to Trevose in accordance with the terms of the workout agreement. On October 19, 1981, the property and land were deeded to Trevose in accordance with the terms of the agreement dated January 15, 1980. After petitioners relinquished their interest in the property, neither they nor 221A Holding Corporation had any remaining liability to Trevose or to any predecessor in interest. The principal balance and delinquent and accrued interest on the mortgage as of October 19, 1981, were as follows: Principal
$ 2,948,465.55
Delinquent interest
529,604.08
Accrued interest as of 9/30/81
19,903.43
Accrued interest 10/1 through 10/19/81
12,278.56
Total
$ 3,510,251.62
*701 Petitioners' cost basis in the improvements on the land was $ 2,450,915. Petitioners claimed a total of $ 768,563 in depreciation from 1974 through 1981. The cost of the land on which the development was built was $ 125,000. The parties stipulated that petitioners' adjusted basis in the property (land and improvements) on October 19, 1981, was $ 1,807,352. Petitioners reflected the October 19, 1981, transfer on a Form 4797 (Supplemental Schedule of Gains and Losses) attached to petitioners' original Form 1040 filed for 1981. They reported gross sales price minus expense of sale as $ 3,443,820, less adjusted basis of $ 3,251,213 (cost or other basis of $ 3,842,463 less depreciation of $ 591,250), for a total gain of $ 192,607. The total gain was reported as a long-term capital gain. In April 1983, petitioners filed an Amended U.S. Individual Income Tax Return (Form 1040X) for 1981, reporting a capital loss of $ 3,000 and net operating loss of $ 1,172,535 because "income reported from sale of assets were reported in error as no sale took place which resulted in a taxable transaction." Petitioners claimed net operating loss carryover deductions of $ 1,172,535 and $ 1,092,160 *702 on their 1982 and 1983 income tax returns. 5. Notice of Deficiency
Respondent made three adjustments to petitioners' reported income for taxable year 1981 in the notice of deficiency. Respondent computed the amount of capital gain realized on the transfer as follows: Section 1001(a) Amount Realized
$ 3,010,000
Section 111 - Recovery Exclusion
445,696
$ 2,564,304
Less: Adjusted Basis
1,807,352
Gain
$ 756,952
Respondent determined the fair market value of the property in October 1981 to be $ 3,010,000. This amount was determined in the notice of deficiency to be the amount realized. The notice of deficiency did not use the term "fair market value," but it used "amount realized." The parties stipulated that the amount realized is the fair market value as determined by respondent which is $ 3,010,000. The "Section 111 - Recovery Exclusion" as determined in the notice of deficiency consists of amounts advanced as part of the various loans from First National and PFSLA to pay construction costs which were included in the principal balance of the loans and which were expensed by petitioners on their Federal income tax returns. Respondent calculated the Section *703 111 - Recovery Exclusion in the amount of $ 445,696 as follows: Original Loan -- $ 2,350,000
(11/1/71)
Permits
$ 8,965
Construction Supervision
34,100
Bank Inspection
2,000
Transfer and R.B. Tax
8,250
Insurance
20,060
Registration
855
$ 74,230
Additional Loan -- $ 150,000
(9/7/73)
All Credited to Interest
150,000
Additional Loan -- $ 500,000
(12/17/73)
Mortgage Insurance
$ 6,000
Recording
551
1973 Taxes
11,250
Interest on Construction Loan
34,759
Interest from 12/17-12/31/73
9,334
PFSLA (Accrued) Interest
257,213
319,107
543,337
Less: Interest Deduction
(1971/1972)
97,641
RECOVERY EXCLUSION
$ 445,696
The second adjustment made by respondent to petitioners' 1981 income was in the amount of $ 484,466, for income from discharge of indebtedness. It was explained as follows in the notice of deficiency: You received income from the discharge of indebtedness of $ 507,198 which was not reported as required by Section 61(a)(12) of the Internal Revenue Code. Based upon Section 111(a), the amount applicable to the recovery exclusion ($ 22,732) is not taxable.
Income
$ 507,198
Recovery Exclusion
22,732
Taxable Portion
$ 484,466
*704 The third adjustment made by respondent to petitioners' 1981 income was the allowance of a $ 788,709 net operating loss deduction, explained as follows in the notice of deficiency: Net operating losses are carried forward as permitted by Section 172 of the Internal Revenue Code.
Loss Year
Amount
1976
$ 225,359
1977
194,808
1978
229,517
1979
135,455
1980
14,523
$ 799,662
Loss Deducted
10,953
$ 788,709
For tax years 1971 through 1975, petitioners claimed the following net operating losses attributable to the property: Tax Year
Net Loss Claimed-Barrier Reefe
1971
$ 16,941.94
1972
150,000.00
1973
367,580.19
1974
278,179.78
1975
290,939.87
Respondent disallowed net operating loss deductions for 1982 and 1983 on grounds that they were utilized in 1981 as required by section 172. In an amendment to answer respondent alleged petitioners' capital gain to be $ 1,140,687, rather than $ 756,952 as determined in the notice of deficiency. OPINION The issues for decision involve the tax consequences of the transfer. Petitioners raise several arguments. Petitioners describe the transfer as "involuntary" and "under duress;" however they do not specifically *705 argue this as an issue. Even if it were so argued, the Supreme Court has held that both forced and voluntary sales constitute dispositions within section 1001. Helvering v. Hammel, 311 U.S. 504, 510, 85 L. Ed. 303, 61 S. Ct. 368 (1941). Petitioners generally view the transfer as a nontaxable transaction. Alternatively, they consider the transfer to result in a long-term capital gain which is reduced under sections 108 and 111 with no ordinary income. As to any discharge of indebtedness income, petitioners argue that they are insolvent under section 108(a)(1)(B), and entitled to a purchase-money debt reduction under section 108(e)(5). Petitioners also assert that they are entitled to an exclusion from income under section 111(a), and that the burden of proof is on respondent as a result of the amendment to answer. Petitioners also counter that respondent's use of the bifurcated approach is improper. 1. Transfer is Taxable Sale or Exchange
Petitioners argue that the transfer in lieu of foreclosure was a collection or a negotiated compromise and debt reduction, and thus no taxable gain results. The transfer of property by deed in lieu of foreclosure is a sale or exchange. Allan v. Commissioner, 856 F.2d 1169, 1172 (8th Cir. 1988), *706 affg. 86 T.C. 655 (1986); Stamler v. Commissioner, 145 F.2d 37, 39 (3d Cir. 1944); Allan v. Commissioner, 86 T.C. 655, 659 (1986), affd. 856 F.2d 1169 (8th Cir. 1988); Freeland v. Commissioner, 74 T.C. 970, 982 (1980); Millar v. Commissioner, 67 T.C. 656, 660 (1977), affd. in part 577 F.2d 212 (3d Cir. 1978). We are not persuaded that this transfer of property in lieu of foreclosure is any different. 2. Recourse Liability
Respondent argues that the underlying mortgage was recourse. Petitioners admit it is not clear from the record whether the debt was recourse or nonrecourse; however, they argue that the loan documents themselves, and the existence of a $ 6 million bond show that the liabilities were nonrecourse. Second, petitioners contend that the loans were nonrecourse by implication from the existence of a $ 6 million bond which effectively eliminates their risk. We disagree with petitioners. The term "nonrecourse" has been defined as the "status of a person who holds an instrument which gives him no legal right against prior endorsers or *707 the drawer to compel payment if the instrument is dishonored." Black's Law Dictionary (5th Edition 1979). Thus, the term "nonrecourse" means that the lienor may look only to the property that is subject to his lien to satisfy his debt and cannot look to the debtor personally for payment. In re Hixson Chevrolet Co., 20 B.R. 108 (Bankr. N.D. Tex. 1982). Petitioners assert that the loan documents make 221A Holding Corporation liable for repayment rather than petitioners. However, both 221A Holding Corporation and petitioners signed the loan documents. Each note states that each party signing it is jointly and severally liable. Thus, the loan documents appear to be recourse. There is nothing in the record suggesting otherwise. Petitioners also argue that the liabilities were nonrecourse because the $ 6 million bond that they executed in favor of PFSLA made it highly doubtful that petitioners' personal assets were subject to collection. The bond provided for joint and several liability. The bond provided for discharge of the obligation only on several conditions, including timely payments of all principal and interest, maintenance of appropriate insurance, *708 payments of taxes, sewer and water rents, and other expenses associated with the development. It prohibited conveyance of the mortgaged premises without prior written consent from PFSLA. In the event of default of the bond provisions, the entire $ 3 million debt was to be accelerated. The warrant of attorney reinforced remedies available to PFSLA. Neither the bond nor the warrant excused petitioners from personal liability. Accordingly, we conclude that the liabilities were recourse. 3. Insolvency Exception Under Section 108(a)(1)(B)
Petitioners argue that the income from the discharge of indebtedness was not taxable because they are eligible for the insolvency exception under section 108(a)(1)(B). See Danenberg v. Commissioner, 73 T.C. 370, 388 (1979). We hold that petitioners have failed to prove that they were insolvent under section 108(a)(1)(B). Gross income does not include any amount which would be includable in income because of the discharge of indebtedness if the discharge occurs when the taxpayer is insolvent. Sec. 108(a)(1)(B). The exclusion is limited to the amount by which the taxpayer is insolvent. Sec. 108(a)(3). Insolvency *709 is the excess of liabilities over the fair market value of assets. Sec. 108(d)(3). If an insolvent taxpayer's debt is discharged, no income is realized because the discharge of indebtedness does not make assets available to the debtor. Quinn v. Commissioner, 31 B.T.A. 142, 145 (1934); cf. United States v. Kirby Lumber Co., 284 U.S. 1, 76 L. Ed. 131, 52 S. Ct. 4 (1931). However, a debtor who is insolvent before the discharge realizes income to the extent such discharge renders him solvent. Conestoga Transportation Co. v. Commissioner, 17 T.C. 506, 513 (1951); Texas Gas Distributing Co. v. Commissioner, 3 T.C. 57, 61-62 (1944). Petitioners claim that they were insolvent on October 19, 1981, when they transferred the property. In their reply brief petitioners cite section 108(e)(2), then argue as follows: This statute, in the plainest terms, mandates that if the payment of the debt would give the debtor a deduction, a discharge of the liability will not result in income or have any other tax consequence. In the present case, it has been stipulated that the total debt as of October, 1981 was $ 3,510,251.62, with all items *710 over the unpaid Principal Amount of $ 2,948,465.55 representing delinquent and accrued interest on the loan -- Stip. of Facts, para. 47 -- which interest, had it been paid, would unquestionably given rise to a tax deduction in the amount of $ 561,786.07. This "constructive" interest deduction is significantly in excess of Respondent's revised adjustment to income from discharge of indebtedness of $ 500,251.62, thus, by operation of I.R.C., Section 108(e)(2), should the Court find it applicable, it should be deemed to "more than" eliminate Respondent's asserted 1981 adjustment to Petitioners' ordinary income. [Fn. ref. omitted.]
The burden of proving insolvency under section 108(a)(1)(B) is on petitioners. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115, 78 L. Ed. 212, 54 S. Ct. 8 (1933). Respondent argues that petitioners have failed to prove insolvency. We agree with respondent. Petitioner estimated that the fair market value of his assets was $ 3,203,299, and that he had $ 3,583,152 in liabilities. Petitioner used the original early 1970s purchase price as the value of the land in St. Croix and Antigua on October 19, 1981. He testified that there had been no appreciation *711 because of the shooting. He did not provide an appraisal of the property. Petitioner used a method akin to capitalization of earnings for the office and apartment building at Lancaster and Elliot Avenues in Bryn Mawr, Pennsylvania. He concluded that the value was $ 130,000 but he did not satisfactorily explain how or why he used this method. Petitioner's summary sheet recites stock "on hand, sold 1981" and valued at $ 21,989. However, petitioners' 1981 Federal income tax return shows a $ 18,485 short-term sale of stock on November 1, 1981, a $ 13,135 long-term sale of stock on October 22, 1981, and a $ 8,854 long-term sale of stock on December 18, 1981. Petitioner's summary sheet lists a value of $ 84,000 for certain McGraw-Hill stock inherited by Mrs. Bressi. The $ 84,000 amount was taken from a letter from W.H. Newbold's Sons & Co., Inc., signed by Norman H. Beck, Jr., that purported to value the stock as of September 1982, a year after the valuation date at issue. The record provides no information as to who Mr. Beck is. Petitioner also purchased 3,500 shares of Huffy stock in January 1982 for $ 33,000 and calls on Penzoil in April 1982 for $ 10,700. This occurred soon *712 after his claimed October 19, 1981, insolvency. Petitioner's largest asset was the Barrier Reefe Apartment property that he valued at $ 2.8 million. Petitioner testified that the value was based on a 1979 appraisal, but he did not provide a copy of it or details about the appraisal. He also produced bankruptcy documents stating the $ 2.8 million value as shown in the schedules filed. However, those documents merely state the same uncorroborated opinion of petitioner. Petitioner's summary sheets show a $ 7,255 account receivable based on a document showing his weekly charges for October 1, 1981, to October 19, 1981. This two-page document has handwritten entries for each patient reflecting the date, the patient's name, and the amount charged. There is no indication whether the patients paid for any of the charges. There is no record of charges for any other period. Petitioner listed a few bank accounts, and an estimated $ 10,000 (not itemized) for personal property. As for liabilities, petitioner listed "Bryn Mawr Trust Company, $ 9,500" as a liability. However, a statement of interest due on demand loan by the Bryn Mawr Trust Company for October 1, 1980, to January 1, 1981, *713 shows principal of $ 9,500 for October 1980 and $ 8,500 for December 1980. Petitioner listed a $ 1,994 Provident Bank auto loan. The record includes an undated notice of loan interest paid for 1981 from the Provident National Bank, indicating $ 227.79 as the amount of interest for a new auto loan. No other amounts are stated on the notice of loan interest. Petitioner does not state how he arrived at the $ 1,994 amount. Petitioner also indicated as a liability business and personal accounts payable in the amount of $ 22,000. At trial, petitioner conceded that the amount should be reduced to $ 12,000. However, he produced no other evidence and did not explain or support the reduced figure. Petitioners' evidence in support of insolvency is unconvincing. Accordingly, we are not persuaded that petitioners were insolvent on October 19, 1981. Consequently, we hold that the insolvency exception to discharge of indebtedness income under section 108(a)(1)(B) is not available to petitioners. 4. Purchase-Money Debt Reduction Under Section 108(e)(5)
Petitioners argue that they may exclude income from the discharge of indebtedness on the grounds that they qualify for a purchase-money *714 debt reduction under section 108(e)(5). Section 108(e)(5) provides: (e) GENERAL RULES FOR DISCHARGE OF INDEBTEDNESS (INCLUDING DISCHARGES NOT IN TITLE 11 CASES OR INSOLVENCY). -- For purposes of this title -- * * * (5) PURCHASE-MONEY DEBT REDUCTION FOR SOLVENT DEBTOR TREATED AS PRICE REDUCTION. -- If -- (A) the debt of a purchaser of property to the seller of such property which arose out of the purchase of such property is reduced, (B) such reduction does not occur -- (i) in a title 11 case, or (ii) when the purchaser is insolvent, and (C) but for this paragraph, such reduction would be treated as income to the purchaser from the discharge of indebtedness, then such reduction shall be treated as a purchase price adjustment.
Petitioners are not eligible for this exception because they have not shown that the debt of the purchaser of property was owed to the seller of the property. Petitioners bear the burden of proof as to this issue. Rule 142(a). They have provided no evidence that the debt which was reduced was the debt of a purchaser to the seller. Consequently, we hold that section 108(e)(5) does not apply here. See DiLaura v. Commissioner, T.C. Memo 1987-291 *715 (mortgagee was not the seller of the residence); Juister v. Commissioner, T.C. Memo 1987-292, affd. without pub. opinion 875 F.2d 864 (6th Cir. 1989) (same as DiLaura). 5. Bifurcation of Petitioners' Gain Under Section 1.1001-2(a)(2), Income Tax Regs.
Respondent contends that the bifurcated approach under section 1.1001-2(a)(2), Income Tax Regs. should be applied here. Ordinarily, when a transferor is discharged from a liability in connection with a sales transaction, the entire current balance of the liability is included in the amount realized. Commissioner v. Tufts, 461 U.S. 300, 312, 75 L. Ed. 2d 863, 103 S. Ct. 1826 (1983); Crane v. Commissioner, 331 U.S. 1, 14, 91 L. Ed. 1301, 67 S. Ct. 1047 (1947); Michaels v. Commissioner, 87 T.C. 1412, 1414-1415 (1986) (citing Vukasovich, Inc. v. Commissioner, 790 F.2d 1409 (9th Cir. 1986), revg. T.C. Memo 1984-611); sec. 1.1001-2(a)(1), Income Tax Regs.
Section 1001 and the regulations thereunder provide the method to determine the amount of gain realized upon a sale or exchange. An exception to the general rule is provided in section 1.1001-2(a)(2), Income *716 Tax Regs., which bifurcates the gain for recourse liabilities. Michaels v. Commissioner, supra at 1415. Section 1.1001-2(a)(2), Income Tax Regs., provides in pertinent part: The amount realized on a sale or other disposition of property that secures a recourse liability does not include amounts that are (or would be if realized and recognized) income from the discharge of indebtedness under section 61(a)(12). * * *
Respondent argues that the transfer resulted in both ordinary income and capital gains by applying the bifurcated approach for recourse liabilities which is set forth in section 1.1001-2(a)(2), Income Tax Regs. Respondent determined that petitioners received ordinary income of $ 500,251.62, which was the excess of the total amount of indebtedness discharged over the fair market value of the property. Respondent also determined that petitioners received capital gains income of $ 1,202,648 based on the excess of the fair market value over petitioners' basis in the property. Petitioners contend that respondent's bifurcated approach was rejected in Allan v. Commissioner, 86 T.C. at 666-667, and Peninsula Properties Co. v. Commissioner, 47 B.T.A. 84, 91-92 (1942). *717 Petitioners' reliance on Allan v. Commissioner, supra, is misplaced. In Allan the obligations were nonrecourse notes; here they are recourse. Moreover, in Michaels v. Commissioner, supra, this Court applied the bifurcated method for recourse notes. Michaels v. Commissioner, supra at 1414-1415. Petitioners also argue that the bifurcated method applies only to recourse obligations and that the discharged debts were nonrecourse. However, we have found the obligations here to be recourse. Accordingly, we hold that the bifurcated approach set forth in section 1.1001-2(a)(2), Income Tax Regs., for recourse liabilities applies here. 6. Amount of Discharge of Indebtedness Income
Having held that respondent's method is correct, we must now decide the amount, if any, of ordinary income from discharge of indebtedness. Discharge of indebtedness is generally included in gross income. Sec. 61(a)(12); United States v. Kirby Lumber Co., 284 U.S. 1, 76 L. Ed. 131, 52 S. Ct. 4 (1931). Under the bifurcated approach, income from discharge of indebtedness is the excess of the debt over the fair market value of the property transferred. *718 Sec. 61(a)(12); sec. 1.1001-2(a)(2), Income Tax Regs. See sec. 1.1001-2, Example (8), Income Tax Regs. Applying this approach respondent determined $ 500,251.62 in ordinary income from the discharge of indebtedness as a result of the transfer. Petitioners concede that "a portion of their mortgage obligation was cancelled." The parties stipulated that the total amount of the debt that was discharged, including principal and interest, was $ 3,510,251.62. However, the fair market value of the property is in dispute. The parties stipulated that in the notice of deficiency, respondent determined that the fair market value of the property on October 19, 1981 was $ 3,010,000. Petitioners asserted at trial that the fair market value of the property on the transfer date was $ 2,800,000. Respondent's "determinations as to matters of fact in the [notice of deficiency] are presumed to be correct, and petitioners have the burden of proving otherwise." Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981); Rule 142(a). Petitioner testified "to his recollection" that the property was appraised around 1979. He could not recall the fair market value except to say that *719 it was less than $ 3,010,000. Petitioner did not offer the appraisal into evidence and could not remember who did the appraisal. Petitioner's testimony was not corroborated. Petitioner provided a document entitled "NOTICE OF FIRST MEETING OF CREDITORS OF HEARING UNDER SECTION 376(2), AND TIME FOR FILING COMPLAINTS TO DETERMINE DISCHARGEABILITY UNDER SECTION 17c(2)," dated June 28, 1979 in the bankruptcy matter of 221 Holding Corporation. The notice listed under a summary of assets and liabilities, real property (total value) of $ 2,800,000, without disclosing how that amount was ascertained or who ascertained it. Consequently, we are reluctant to give this document much weight as proof that the fair market value of the property on October 19, 1981, was $ 2,800,000. We conclude that petitioner has not overcome the presumption of correctness of the determination in the notice of deficiency. The excess of the total debt ($ 3,510,251.62) over the fair market value of the property when transferred ($ 3,010,000) is $ 500,251.62. Consequently, we hold that petitioners realized and recognized ordinary income from discharge of indebtedness as a result of the transfer of $ 500,251.62. *720 7. Amount of Capital Gains
Gain or loss on the sale or exchange of property is determined by the difference between the amount realized on the disposition and the adjusted basis in the property. Sec. 1001(a). The amount realized from the sale or other disposition of property is the sum of any money received plus the fair market value of the property (other than money) received. Sec. 1001(b). As discussed above, under the bifurcated method discharge of indebtedness income is not included in the amount realized. Sec. 1.1001-2(a)(2), Income Tax Regs. Therefore, the capital gain component in this case is the excess of the fair market value of the property over the adjusted basis in the property. We have found the fair market value of the property to be $ 3,010,000 and the parties have stipulated that the adjusted basis in the property (land and improvements) on October 19, 1981 was $ 1,807,352. Accordingly, subject to deciding whether petitioners are allowed an exclusion under section 111 (discussed next), petitioners realized and recognized capital gains on the transfer of the property of $ 1,202,648. 8. Recovery Exclusion Under Section 111(a)
Petitioners argue *721 that respondent's determination that they were not allowed any recovery exclusion under the tax benefit rule as codified in section 111(a) is incorrect. Petitioners assert that under section 111, $ 715,397 is the amount to be deducted from the amount of gain realized from the October 1981 transfer. Section 111(a) provides: (a) GENERAL RULE. -- Gross income does not include income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount. (b) DEFINITIONS. -- For purposes of subsection (a) -- * * * (4) RECOVERY EXCLUSION. -- The term "recovery exclusion", with respect to a bad debt, prior tax, or delinquency amount, means the amount, determined in accordance with regulations prescribed by the Secretary, of the deductions or credits allowed, on account of such bad debt, prior tax, or delinquency amount, which did not result in a reduction of the taxpayer's tax under this subtitle * * * reduced by the amount excludable in previous taxable years with respect to such debt, tax, or amount under this section.
Petitioners contend that they *722 deducted depreciation, insurance, interest, and other expenses, but could not use the deductions because they were in loss years. They assert that they carried the deductions forward for 5 years and lost them under section 172(b)(1)(B). We do not need to resolve these facts because of our conclusion regarding a recovery. Petitioners assume that the transfer constitutes a recovery under section 111(a). Respondent contends that section 111(a) is not applicable because there was no recovery to which the exclusion would apply. We agree with respondent. The exclusionary aspect of the tax benefit rule is partially codified in section 111. "The corollary, emphasizing the inclusionary aspect, is that when an item previously deducted by the taxpayer is restored, it must be included in income to the extent that the earlier loss (deduction) generated a tax benefit." Rosenberg v. Commissioner, 96 T.C. 451, 455 (1991); see generally Rojas v. Commissioner, 90 T.C. 1090, 1097 (1988), affd. 901 F.2d 810 (9th Cir. 1990). The term "recovery" is not defined in the statute. Treasury regulations define recovery as "the receipt of amounts *723 in respect of the previously deducted or credited section 111 items, such as from the collection or sale of a bad debt, refund or credit of taxes paid, or cancellation of taxes accrued." Sec. 1.111-1(a)(2), Income Tax Regs. The recovery exclusion is not limited to the recovery of bad debts and taxes. Rather, it includes other items included in income as a result of the tax benefit doctrine. See Dobson v. Commissioner, 320 U.S. 489, 88 L. Ed. 248, 64 S. Ct. 239 (1943); sec. 1.111-1(a), Income Tax Regs.
Inclusion of an item deducted in a previous year is required only if there is a later event which is "fundamentally inconsistent with the premise on which the deduction was initially based. That is, if the event had occurred within the same taxable year, it would have foreclosed the deduction." Hillsboro National Bank v. Commissioner, 460 U.S. 370, 383-384, 75 L. Ed. 2d 130, 103 S. Ct. 1134 (1983). (Fn. ref. omitted.) Similarly, the exclusionary aspect of the tax benefit rule in section 111 "should apply to an item that would otherwise be gross income only if the gross income is recognized to reflect an event fundamentally inconsistent with the premise of an earlier deduction." Bittker & Lokken, Federal *724 Taxation of Income, Estates and Gifts, par. 5.7.3, pp. 5-62 through 5-63 (2d ed. 1989); see also Home Mutual Insurance Co. v. Commissioner, 639 F.2d 333, 345-346 (7th Cir. 1980), affg. in part, revg. in part, and remanding in part 70 T.C. 944 (1978) ("the exclusionary aspect * * * becomes relevant only after the Commissioner has employed the inclusionary aspect"); Rosenberg v. Commissioner, supra at 456-457. In deciding Allan v. Commissioner, supra, this Court applied the Hillsboro criterion for "recovery" and held that the satisfaction of a debt upon the transfer of mortgaged property to the mortgagee was not a "recovery" of any previously deducted amounts of interest or taxes which had been paid by the mortgagee and added to the principal of the debt. In Rosenberg v. Commissioner, supra at 456, we again applied the Hillsboro criterion and held that the sale of condominium units in 1984 did not effectuate, within the meaning of section 111(a), a recovery of the interest and taxes paid by the taxpayer. We further stated: In this case, there is nothing "fundamentally inconsistent" *725 about the corporation's deductions of taxes and interest followed by the inclusion of the proceeds of the condominium sales in its gross sales for the years in which the sales are made. Indeed, the record clearly establishes that those sales were contemplated, and strived for, from the beginning of the corporate existence.
Rosenberg v. Commissioner, supra at 457. As in Rosenberg v. Commissioner, supra, there is nothing in this case "fundamentally inconsistent" about petitioners' deductions of interest, taxes, insurance, consulting fees, depreciation, and other expenses, followed by the inclusion of the proceeds from the transfer. Sales of the units were the ultimate goal of petitioners. The transfer in lieu of foreclosure was essentially a sale for purposes of this analysis. Accordingly, we conclude that there has been no recovery under section 111(a) and hold that petitioners are not entitled to any exclusion under section 111(a). Consequently, we sustain respondent's position as stated in the amendment to answer. Petitioners also argue that respondent's theory under section 111 must be based on a finding that the obligations were recourse, *726 which petitioners deny. In light of our holding that there was no recovery under section 111(a), we need not reach this issue. 9. Burden of Proof on Respondent for Increased Deficiency
For 1981, respondent asserted an increased deficiency from $ 70,821.09 to $ 162,245.26 by amendment to answer. In it respondent argued that the allowance of adjustments under section 111 in the notice of deficiency was erroneous and that the mortgage was nonrecourse. Petitioners maintain that respondent's amendment to answer significantly revised the legal theory and possibly the facts relied upon by respondent in the notice of deficiency. Thus, petitioners assert that the presumption of correctness is destroyed and that respondent bears the burden of proof for all factual issues in the case. Respondent's position in the amendment to answer is that it was a mistake to allow any section 111 exclusion in the notice of deficiency because there was no "recovery," and that because the mortgage was nonrecourse, the gain realized and recognized was the excess of the outstanding debt over the adjusted basis. This theory involves the same facts required to decide this case under the notice of *727 deficiency. In the motion for leave to file amendment to answer, respondent argued: As a matter of law, the amount realized when property is transferred in complete satisfaction of a non-recourse debt is the entire principal amount of the debt, regardless of whether such amount includes amounts included in the basis of the property or whether the amount includes amounts advanced to pay deductible expenses. See Allen [sic] v. Commissioner, 86 T.C. 655 (1986). Respondent is not aware of any authority which would allow for a reduction on the amount realized for a section 111 recovery exclusion.
Respondent argues that no adjustment is required under section 111. Petitioners argue that they are entitled to a larger exclusion under section 111 than was originally allowed in the notice of deficiency. The operative facts upon which this issue will be decided are the same for both parties. As to the underlying deficiency as stated in the notice before the amendment to answer, petitioners must prove each of the elements in section 111, including that a recovery under section 111 occurred. As discussed above, a recovery under section 111 occurs only if there *728 is a later event which is "fundamentally inconsistent with the premise on which the deduction was initially based." Rosenberg v. Commissioner, 96 T.C. 451 at 457 (quoting Hudspeth v. Commissioner, 914 F.2d 1207, 1212-1213 (9th Cir. 1990). Thus, petitioner must prove that the transfer was fundamentally inconsistent with the deductions taken earlier. Respondent's position, on the other hand, is that no exclusions under section 111 are allowable because the transfer was not fundamentally inconsistent with petitioners' earlier deductions. Consequently, the parties' positions rely on opposite interpretations of the same facts. If petitioners show that they are entitled to any section 111 exclusions, then, necessarily, respondent's theory of no recovery fails as to those amounts. Thus, to the extent that petitioners are successful, respondent is unsuccessful and vice versa. The notice of deficiency allowed for some exclusions under section 111. The amended answer disallows all exclusions under section 111. Respondent bears the burden of proving any increase in the deficiency. Rule 142(a); Reiff v. Commissioner, 77 T.C. 1169, 1173 (1981). *729 Petitioners cite Clinton Cotton Mills, Inc. v. Commissioner, 78 F.2d 292 (4th Cir. 1935), revg. 28 B.T.A. 1312 (1933), for the proposition that where the Commissioner's method is erroneous, the presumptive correctness of the determination no longer avails. However, we read that case to have held that the Commissioner's determination of a deficiency loses its presumption of correctness when grounded upon error of law. Clinton Cotton Mills, Inc. v. Commissioner, supra at 295. Petitioners have not convinced us of such an error of law in this case. Petitioners alternatively argue that if we hold that respondent's initial notice of deficiency was not clearly erroneous, then we should conclude that respondent's amendment to answer is arbitrary. We do not agree that respondent's position is arbitrary. 10. Whether the Amounts Claimed as Net Operating Loss Deductions for 1982 and 1983 were Correct
Although mentioned in the petition, petitioners did not brief this issue. Accordingly, we treat this as a concession by petitioners. Rothstein v. Commissioner, 90 T.C. 488, 497 (1988); Reaves v. Commissioner, 31 T.C. 690, 722 (1958), *730 affd. 295 F.2d 336 (5th Cir. 1961). To reflect the foregoing, as well as concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩